## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

**DOUG MCGONEGLE,**

      **Plaintiff**

      **v.**                          **Case No. 1:19–cv–442**
                                        **JUDGE DOUGLAS R. COLE**

**SELECT COMFORT RETAIL**
**CORPORATION,**

      **Defendant.**

## OPINION AND ORDER

This cause is before the Court pursuant to Defendant Select Comfort Retail Corporation's ("Sleep Number") Motion for Summary Judgment (Doc. 28). The Court held oral argument on that Motion on December 21, 2020. In short, the parties dispute whether Sleep Number improperly terminated McGonegle's employment due to his disability or perceived impairment relating to his essential tremor condition. The question before the Court at the summary judgment stage, though, is whether McGonegle raises a genuine dispute of material fact that requires jury resolution. For the reasons discussed more fully below, the Court concludes that he does, but only as to his regarded-as-disabled theory, and thus **DENIES** Sleep Number's Motion (Doc. 28).

## FACTUAL BACKGROUND

Douglas McGonegle worked as an at-will employee for Sleep Number, a mattress and sleep accessory retailer, from July 13, 2015 until Sleep Number terminated his employment on October 23, 2017. (Def.'s Proposed Undisputed Facts

("PUF"), Doc. 28-1, #551–54). During this time, McGonegle worked in sales, eventually earning the title of "Sleep Expert," Sleep Number's highest level of salesperson. (*Id.* at #552). Only once did McGonegle miss his sales goals—otherwise he consistently met Sleep Number's performance expectations.

Despite his strong sales performance, the relationship between McGonegle and his employer soured after an incident in October 2017. On October 15, 2017, a customer, Rod Caminiti, came to the store at which McGonegle worked and wanted to buy a mattress and base, bringing with him a $1,000 coupon. (*Id.* at #559). McGonegle discussed a potential sale with Caminiti. Caminiti's preferred model, the "split i8 king" mattress with a "FlexFit 2/FF2" adjustable base, carried a total pre-tax price tag of $7,599.97. (*Id.*). Even with his coupon, Caminiti found the price prohibitive, and left without making a purchase. (*Id.* at #560).

In an attempt to salvage the sale, McGonegle called Caminiti a few days later and offered him a reduced price in the $3,400 to $3,600 range, reflecting what Caminiti believed to be roughly a $4,200 discount. (Pl.'s Resp. to PUF, Doc. 31-1, #630–31). McGonegle disputes that he offered a discount of the magnitude Caminiti claims. According to McGonegle, during the call, he quoted the price that Caminiti claimed, but McGonegle says he quoted that price on a "flat set" (i.e., non-adjustable base) that had a significantly lower list price. (Pl.'s Resp. to Summ. J., Doc. 31, #620).

In any event, enticed by the offer, Caminiti returned to the Sleep Number store on October 22. (PUF, Doc. 28-1, #560). After discovering McGonegle was not working that day, Caminiti spoke to the store manager, Julie Roborecki, who was also

2

McGonegle's supervisor. (*Id.*). Caminiti inquired about the discounted price that he claimed McGonegle had offered over the telephone, which McGonegle understood to apply to an adjustable base, but Roborecki replied that no such discount was available. (*Id.* at #561). Caminiti once again left the store mattress-less.

After Caminiti left, Roborecki did some quick calculations and determined that the discounted price that Caminiti claimed McGonegle had offered on an adjustable base seemed to resemble the price that would have resulted from a then-ongoing "Friends & Family" discount. (*Id.* at #562–63). But that discount, per Sleep Number's internal announcement, was emphatically "**NOT** for leads or customers." (*Id.* at #562). What is more, Sleep Number's internal announcement to its employees about the promotion clearly spelled out that misusing the promotion could result in both an investigation and disciplinary action. (*Id.*). McGonegle himself testified that he knew offering the discount to unauthorized persons could lead to termination. (*Id.* at #564). To rectify Caminiti's negative experience, Roborecki requested and obtained permission from William Smith, a Sleep Number district manager, to sell the items to Caminiti for $3,900. (*Id.* at #563).

But, based on her suspicions that McGonegle violated Sleep Number's policy by quoting the Friends & Family discount price to Caminiti, Roborecki also contacted Sarah Dudley, a Sleep Number HR representative. Roborecki asked Dudley if McGonegle could be terminated for improperly offering the discount. (Dudley Email, Doc. 22-6, #379–80). Dudley informed Roborecki that a single instance of improper discounting alone would not warrant termination and suggested that Roborecki

instead take verbal corrective action with McGonegle. (*Id.* at #379). Dudley did, however, note that inappropriate or disruptive behavior might warrant terminating McGonegle's employment. (*Id.*).

The day after talking to Dudley, Roborecki confronted McGonegle about the unauthorized discount. (PUF, Doc. 28-1, #565). While it is clear that this exchange did not end well, the parties dispute what, exactly, occurred. Sleep Number claims that McGonegle became upset, yelling, cursing, and storming out of the store—and alleges that he did so despite the store being crowded with customers. Its only source of evidence for this version of events, though, is Roborecki. McGonegle, on the other hand, denies that any such outburst occurred. (Pl.'s Resp., Doc. 31, #635). He states that he neither raised his voice nor used profane language, and claims that all he did was leave the store on short, routine breaks. (McGonegle Dep., Doc. 21, #116–17). Other than the competing and inconsistent statements from Roborecki and McGonegle, the record contains no testimony (or other evidence) about the encounter or McGonegle's behavior.

Roborecki testified that McGonegle's outburst, along with the unauthorized discount he presented to Caminiti, triggered her decision to seek McGonegle's termination. (PUF, Doc. 28-1, #567). After Roborecki relayed her recollection of the incident to William Smith and Sara Dudley, they decided as a group to fire McGonegle. (*Id.*). Roborecki broke the news to McGonegle in a meeting attended by John Wood, a Sleep Number store manager. At the meeting, the two Sleep Number employees provided McGonegle a written notice stating four reasons for his

termination: (1) offering the Friends and Family discount to a person outside Sleep Number's guidelines; (2) reacting with hostility when confronted about that discount; (3) attempting to involve Caminiti in the dispute and calling the customer a liar; and (4) leaving the store during work hours without approval. (*Id.*). McGonegle did not take this decision lying down. He refused to leave the store and ultimately security had to escort him away. (*Id.* at #568).

In the aftermath, McGonegle contacted Sleep Number officials, asking them to revisit the termination decision. (*Id.* at #568). He provided reasons why he believed his termination was unwarranted, such as Caminiti's alleged dishonesty about the discount, but did not raise any allegations of disability discrimination. (*Id.*). He also contacted Caminiti, asking him to communicate with Sleep Number and make statements supporting McGonegle's reinstatement efforts. (*Id.* at #569). In the end, though, Sleep Number stood firm in its decision. And it did so even though it typically does not fire employees for their first offense of offering an improper discount. (*See* Dudley Dep., Doc. 25, #477).

It is undisputed that, throughout these events, McGonegle neither mentioned his alleged longstanding neurological condition—a condition called "essential tremor" that sometimes causes his hands to involuntarily shake—nor any potential discriminatory treatment suffered during employment (or at the time of termination). Even so, it is also undisputed that McGonegle's physician, Dr. Gerke, had previously diagnosed him with the condition. (Gerke Decl., Doc. 30-1, #578). In Dr. Gerke's words: "Essential Tremor is a neurological disorder that causes involuntary

5

movement, typically in the hands, fingers, or arms." (*Id.*). The doctor further testified that "the normal operation of the neurological system of individuals suffering from Essential Tremor is substantially limited." (*Id.*). McGonegle, however, stated during his deposition that he did not believe that his tremor substantially limited him in any way. (McGonegle Dep., Doc. 21, #78–79, 137). At most, McGonegle testified that the tremor (1) causes him difficulty when "trying to work with little screws when [he] fix[es] toasters," (2) makes it hard to write legibly "at times" unless McGonegle focuses on his penmanship, and (3) forces McGonegle to take "a little longer" to do manual tasks, like operating his car's rear window defroster. (*Id.*).

Approximately two weeks after Sleep Number terminated his employment, McGonegle had an "epiphany" that his employer had fired him for discriminatory reasons. Based on his further reflection, McGonegle suspected that his shaking hands bothered Roborecki, who allegedly told him that it "doesn't look good" when his hands shake in front of customers. (*Id.* at #83). McGonegle estimates that, over the course of approximately ten months at the store, Roborecki negatively commented on his hand tremor on five separate occasions, and brought up the tremor between fifteen and twenty times. (*Id.* at #83–84, 107). What is more, during the course of this litigation, McGonegle has also learned in greater detail about comments that Roborecki made to other Sleep Number employees, including Matt Lamantia, Sarah Dudley, and William Smith, which implied that McGonegle's shaking hands might stem from a drinking problem or another serious health issue. (*See* Lamantia Dep., Doc. 26, #495; Smith Dep., Doc. 24, #459–60; Roborecki Dep., Doc. 22, #336–37).

Based on Roborecki's numerous comments about his shaking hands, McGonegle concluded that Roborecki, and thus Sleep Number, discriminated against him because of his essential tremor.

Consistent with that understanding, on or about December 28, 2017, McGonegle filed a charge of discrimination with the Equal Employment Opportunity Commission ("EEOC"). (Compl., Doc. 1, #2). He claimed that Sleep Number fired him on account of a disability, namely his essential tremor condition. (*Id*.). The EEOC issued a right to sue letter on March 14, 2019, and this action followed shortly thereafter. (*Id*.).

## PENDING MOTIONS

In his Complaint here, McGonegle argues that Sleep Number's justification for terminating his employment was "mere pretext for disability discrimination on account of [his] tremors." (*Id*. at #4). Based on that, McGonegle advances a one-count disability discrimination suit against Sleep Number under the Americans With Disabilities Act ("ADA") and Ohio Revised Code § 4112. But, while McGonegle asserts only one claim based on Sleep Number's termination, he relies on two separate theories for showing that he was disabled under the ADA: (1) that he "suffers from an [actual] impairment," and (2) that "Sleep Number regarded him as disabled." (*Id*.). For relief under either theory, McGonegle seeks compensatory damages, punitive damages, attorney's fees, plus reinstatement to his position at Sleep Number. (*Id*. at #5).

With discovery now closed, Sleep Number has moved for summary judgment on McGonegle's discrimination claim. Because McGonegle failed to allege direct evidence of disability discrimination, Sleep Number contends that McGonegle must clear the *McDonnell Douglas* burden-shifting test to defeat summary judgment. Sleep Number argues he cannot do as to either theory. As for the "actually disabled" argument, Sleep Number asserts that McGonegle's essential tremor does not qualify as a disability under the ADA or Ohio law (which adopts the ADA definition of "disability"), and thus he cannot make out his prima facie case at step one of *McDonnell Douglas*.

That leaves McGonegle's regarded-as-disabled theory, which Sleep Number contests on two grounds. First, Sleep Number argues that McGonegle failed to show that his employer believed he had an impairment, and thus fell short of establishing his prima facie case. Second, Sleep Number contends that it has offered a non-discriminatory reason for his termination, and that McGonegle cannot show the proffered reason is pretextual, meaning he fails at step three of *McDonnell Douglas*.

In opposing summary judgment, McGonegle argues that Sleep Number has not shown an absence of a genuine dispute of material fact over (1) McGonegle's actual disability or regarded-as-disabled arguments, or (2) whether Sleep Number's reasons for terminating McGonegle were legitimate, and not pretextual. This matter is now ripe and properly before the Court.

## LEGAL STANDARD

Summary judgment is proper "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The burden is on the moving party to conclusively show that no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Lansing Dairy, Inc. v. Espy*, 39 F.3d 1339, 1347 (6th Cir. 1994). Once the movant presents evidence to meet its burden, the nonmoving party may not rest on its pleadings, but must come forward with significant probative evidence to support its claim. *Celotex*, 477 U.S. at 324; *Lansing Dairy*, 39 F.3d at 1347.

This Court is not obliged to sua sponte search the record for genuine issues of material fact. *Betkerur v. Aultman Hosp. Ass'n*, 78 F.3d 1079, 1087 (6th Cir. 1996); *Guarino v. Brookfield Twp. Trs.*, 980 F.2d 399, 404–06 (6th Cir. 1992). The burden falls upon the nonmoving party to "designate specific facts or evidence in dispute." *Jordan v. Kohl's Dep't Stores, Inc.*, 490 F. App'x 738, 741 (6th Cir. 2012) (quotation omitted). If the nonmoving party fails to make the necessary showing for an element upon which it bears the burden of proof, then the moving party is entitled to summary judgment. *Celotex*, 477 U.S. at 323.

Granting summary judgment depends upon "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Amway Distribs. Benefits Ass'n v. Northfield Ins. Co.*, 323 F.3d 386, 390 (6th Cir. 2003) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). In sum, the nonmoving party, at this stage, must present some "sufficient disagreement" that would necessitate submission to a

jury. *See Moore v. Phillip Morris Cos., Inc.*, 8 F.3d 335, 340 (6th Cir. 1993) (quoting *Anderson*, 477 U.S. at 251–52). In making that determination, though, this Court must view the evidence in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Cox v. Ky. Dep't of Transp.*, 53 F.3d 146, 150 (6th Cir. 1995) ("In arriving at a resolution, the court must afford all reasonable inferences, and construe the evidence in the light most favorable to the nonmoving party.").

## LAW AND ANALYSIS

Under the ADA,[1] plaintiffs may show discrimination based on wrongful termination through direct or indirect evidence. *Ferrari v. Ford Motor Co.*, 826 F.3d 885, 891 (6th Cir. 2016), *abrogated on other grounds by Babb v. Maryville Anesthesiologists P.C.*, 942 F.3d 308 (6th Cir. 2019). Here, McGonegle does not advance a direct evidence theory. Thus, the Court analyzes his claim at the summary judgment stage under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). The Sixth Circuit describes the analysis that applies at summary judgment as follows:

> *McDonnell Douglas* first requires the plaintiff to establish a prima facie case of discrimination. If she can, the burden shifts to the defendant, who must produce legitimate, nondiscriminatory reasons for the adverse employment action. And if the employer can produce those reasons, the burden shifts back to the plaintiff to establish that the proffered reasons

[1] Although McGonegle brought his wrongful-termination-based discrimination claim under both the ADA and the Ohio Revised Code, "Ohio's disability discrimination law parallels the ADA, [so] the same analytical framework applies to [p]laintiff's claims under Ohio Revised Code § 4112.02." *Anaissie v. Univ. Cincinnati Phys., Inc.*, No. 1:15cv701, 2018 WL 1456102, at *4 (S.D. Ohio Mar. 23, 2018). Thus, the Court analyzes McGonegle's discrimination lawsuit under the ADA framework.

> are simply pretext for age discrimination. If the plaintiff satisfies this third step, the factfinder may reasonably infer discrimination.

*Miles v. S. Cent. Hum. Res. Agency, Inc.*, 946 F.3d 883, 887 (6th Cir. 2020) (citations omitted). Here, Sleep Number seeks summary judgment at both the first and third steps of the *McDonnell Douglas* framework. That is, Sleep Number claims that (1) McGonegle cannot establish his prima facia case, and (2) even if he could, he has failed to create a genuine dispute as to whether Sleep Number's proffered reasons for his termination are pretextual. The Court addresses each of these issues in turn.

**A.    McGonegle Has Failed To Establish A Prima Facie Case As To His "Actually Disabled" Theory, But Has Met His Burden On That Front For His Regarded-As-Disabled Theory.**

The first step under *McDonnell Douglas* is determining whether McGonegle has made a prima facie discrimination case. To establish a prima facie discrimination case under the ADA, a plaintiff must show that: "(1) he or she is disabled; (2) otherwise qualified for the position, with or without reasonable accommodation; (3) suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled individual was replaced." *Barlia v. MWI Veterinary Supply, Inc.*, 721 F. App'x 439, 444 (6th Cir. 2018) (quoting *Whitfield v. Tennessee*, 639 F.3d 253, 259 (6th Cir. 2011)).

The parties here principally dispute whether McGonegle can make the necessary showing as to the first element of the prima facie case (i.e., whether McGonegle is "disabled" for purposes of the ADA). Importantly, there are three different avenues to meeting that element. "To qualify as disabled under the ADA, an

11

individual must: (1) be actually disabled, i.e., suffer from 'a physical or mental impairment that substantially limits one or more major life activities,' (2) have 'a record of such an impairment,' or (3) be 'regarded as having such an impairment.'" *Id.* at 445 (quoting 42 U.S.C. § 12102(1)). This case involves both the first option, being "actually disabled," and the third option, being regarded as impaired. The Court thus considers whether McGonegle has made a sufficient showing on either of these two theories as to avoid summary judgment.

### 1.  *McGonegle Fails To Show An Actual Disability Under The ADA.*

To establish an actual "disability" under the ADA, a plaintiff must show a "physical or mental impairment that substantially limits one or more major life activities." 42 U.S.C. § 12102(1)(A). According to the statute, major life activities "include, but are not limited to, caring for oneself, performing manual tasks, seeing, hearing, eating sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working." *Id.* at § 12102(2)(A). While the statute provides a non-exhaustive list, determining the precise bounds of what constitute other, non-listed major life activities "remains difficult" given that "the statutory text itself [is] largely unhelpful" and that "caselaw ... has done little to explicate a general test to use in deciding the issue." *Hentze v. CSX Transp., Inc.*, No. 1:17-cv-217, 2020 WL 4569127, at *10 (S.D. Ohio Aug. 7, 2020).

That being said, it is clear that "not every impairment, illness or injury will constitute a disability," especially when the plaintiff provides "no medical proof that [the] alleged medical conditions substantially limited a major life activity." *Perry v.*

12

*Am. Red. Cross Blood Servs.*, No. 3-13-1146, 2015 WL 1401058, at *2 (M.D. Tenn. Mar. 26, 2015), *aff'd on other grounds*, 651 F. App'x 317 (6th Cir. 2016). At the same time, "[a]n impairment need not prevent, or significantly or severely restrict ... a major life activity" to constitute an actual disability. 29 C.F.R. § 1630.2(j)(1)(ii). "[F]or cases on the margin, the [ADA] includes a 'rule of construction' that tips in favor of coverage. It instructs that the definition of disability 'shall be construed in favor of broad coverage of individuals ... to the maximum extent permitted by the terms' of the ADA." *Darby v. Childvine, Inc.*, 964 F.3d 440, 445 (6th Cir. 2020) (quoting 42 U.S.C. § 12102(4)(A)).

Adding to the confusion, Congress amended the ADA in 2008 to state that the term "major life activity also includes the operation of a major bodily function, including but not limited to, functions of the immune system, normal cell growth, digestive, bowel, bladder, neurological, brain, respiratory, circulatory, endocrine, and reproductive functions." 42 U.S.C. § 12102(2)(B). Accordingly, under the revised statute's plain language, a substantial limitation on a plaintiff's neurological system operations would constitute a substantial limitation on a major life activity sufficient to show a disability.

Moreover, to determine whether a bodily function is limited to the degree requiring protection under the ADA (i.e., "substantially" limited), courts generally ask how well the plaintiff's major bodily function operates "'as compared to' the general population." *Darby*, 964 F.3d at 445 (quoting *Lonergan v. Fla. Dep't of Corr.*, 623 F. App'x 990, 993 (11th Cir. 2015)). Although a "substantial limitation need not

be severe," merely alleging "difficulties" related to the operation of a major bodily function does not show actual disability. *Miller v. Md. Dept. of Nat. Res.*, 813 F. App'x 869, 876 (4th Cir. 2020). In other words, an actual disability argument that fails to explain how plaintiff's impairment limits him as compared to the general populace is "exactly the type of conclusory allegation devoid of any reference to actual events that will not survive a motion to dismiss." *Id.*

Against this (admittedly somewhat muddled) backdrop, the Court begins by noting that aggrieved employees typically raise actual disability arguments only when seeking a reasonable accommodation. *See Alexander v. Washington Metro. Area Transit Auth.*, 826 F.3d 544, 547 (D.C. Cir. 2016). That is so because "[w]here an individual is *not* challenging a covered entity's failure to make reasonable accommodations and does not require a reasonable accommodation, it is generally unnecessary to proceed under the 'actual disability' or 'record of' prongs, which require a showing of an impairment that substantially limits a major life activity or a record of such an impairment." 29 C.F.R. § 1630.2(g)(3) (emphasis added). As further described below, a regarded-as-disabled theory does not include the substantially-limited requirement. Thus, perhaps not surprisingly, "the regarded-as prong has become the primary avenue for bringing the type of discrimination claim[s]" that seek to redress adverse employment actions. *Alexander*, 826 F.3d at 547.

Here, McGonegle does not claim that his employer failed to accommodate his disability, but instead challenges Sleep Number's termination decision. Thus,

McGonegle's decision to press an actual disability theory appears puzzling, as it is no more efficacious than a regarded-as-disabled theory in terms of the remedies he seeks in his Complaint (e.g., compensatory damages, punitive damages, and reinstatement), yet requires a heightened showing that is not necessary for the latter.

That being said, nothing prevents McGonegle from pursuing an actual disability argument if he so desires. To proceed past summary judgment based on such a theory, however, he must identify a major life activity and create a least a genuine dispute as to whether he experiences an "impairment" that "substantially limits" that major life activity. Here, McGonegle attempts to meet that burden by arguing that his essential tremor, which impacts the operation of his neurological system, qualifies as an impairment that limits a major life activity. (Pl.'s Resp., Doc. 31, #608).

The first impediment to that argument is McGonegle's direct affirmation, under oath, that he believes that his tremor does not substantially limit him in any way. (McGonegle Dep., Doc. 21, #78; Pl.'s First Supp. Resps., Doc. 21-4, #166). He now seeks to skirt that admission's potential harm to his case by suggesting that even if his tremor does not substantially limit him in his activities, that does not prevent a finding that the operation of McGonegle's neurological system (which is a "major bodily function") might be substantially limited in comparison to the general population. On that front, McGonegle relies on the expert opinion from Dr. Gerke, who declares that "[c]ompared to the general population, the normal operation of the neurological system of individuals suffering from Essential Tremor is substantially

limited. Members of the general population unaffected by essential tremor or other physiological disorders do not suffer persistent involuntary movement in their hands, fingers or arms." (Gerke Decl., Doc. 30-1, #578). According to McGonegle, under the ADA's plain language, this substantial limitation as to a major bodily function suffices.

The Court disagrees. Even construing all factual assumptions in McGonegle's favor, as the Court must at the summary judgment stage, McGonegle has not shown that his essential tremor substantially limits a major life activity. Let's start with such activities not involving the "operation of a major bodily function." The illustrative examples of these "major life activities" that the statute provides include things like walking, standing, lifting, bending, breathing, or performing manual tasks. 42 U.S.C. § 12102(2)(A). McGonegle's cited difficulties appear to be the closest fit with that latter category—performing manual tasks. But difficulties with "trying to work with little screws when [McGonegle] fix[es] toasters," (McGonegle Dep., Doc. 21, #78), or the fact that it takes McGonegle "a little longer" to operate his car's rear window defroster, (*id*.), do not amount to "substantial limitations," even under a generous reading of that term, on the overall activity of "performing manual tasks." Nor does difficulty in writing, "at times," "without focusing," carry him across the line. (*Id*.).

On the other hand, McGonegle's argument based on the deficiencies in the operation of a major bodily function (here, his neurological system) is admittedly a closer call. That is in part because of ambiguity created by the statutory text. The

16

statute expressly defines the term "major life activity" to include "the operation of a major bodily function," but there is not necessarily an easy fit between the categories of "activity" and "operation." Generally speaking "activities" refers to things that people *do*, not to how their bodies *operate*. So, some clarification on exactly how "operation of a major bodily function" is meant to fit within the category "activity" would be helpful.

Further muddying the water, the plaintiff pursuing this path must identify not only the "major bodily function" that is not operating properly, but under the ADA's plain language must also show an "impairment" that "substantially limits" the operation of that major bodily function. 42 U.S.C. § 12102(1)(A) (defining disability as "[1] a physical or mental impairment [2] that substantially limits [3] one or more major life activities"). Moreover, the regulations interpreting this provision make clear that an "impairment" is "any physiological disorder or condition … affecting one or more bodily systems," such as the "neurological" system. 29 C.F.R. § 1630.2(h)(1). So putting that all together, a plaintiff must show (1) a condition (i.e., an "impairment"), and (2) that the condition "substantially limits" (3) "operation of a major bodily function."

The question here is what is necessary to make the "substantially limits" showing in the context of a claim based on the operation of a major bodily function. As noted above, as applied to most activities (such as walking), "substantially limited" merely means something like "does not perform this activity as well as the general population." So, for example, if as a result of some condition, a person's ability to walk

17

is well below average, then that would constitute a substantial limitation on that major life activity.

But the implications of carrying that analysis over to the "operation of a major bodily function" type of "major life activity" is not entirely clear. Is it enough to show that the operation of a given person's identified "major bodily function" is merely *different from* that of most people in the population, or must the person also establish some kind of substantial functional impairment that follows from that difference? McGonegle advocates for the former. He argues that his expert's opinion confirms that his neurological system operates differently from that of most other people, and that he need not also show any meaningful functional impairment to make his case.

McGonegle's approach is difficult to square with the statutory text. Under his theory, the diagnosis of virtually any condition relating to the operation of a major bodily function, in and of itself, would suffice to show an actual disability. After all, a medical determination that something constitutes a "condition" or "disease" or "diagnosable event" of a major bodily function typically *means* that the major bodily function at issue operates differently, and in some way worse, for that person than for the population at large. On that understanding, though, *every* "physical impairment" of a major bodily function (i.e., every diagnosable "condition" involving the operation of a major bodily function) would necessarily also constitute a "disability," as it means that person's major bodily function operates differently as compared to the general populace.

The ADA's own text, however, says the contrary. As noted, a plaintiff must show *both* an impairment (which is defined to mean "condition," *see* 29 C.F.R. § 1630.2(h)(1)) *and* a resulting "substantial limitation" to the major bodily function. To say that a condition, in and of itself, is sufficient basis to show an actual disability would thus be to read the term "substantially limits" out of the statute. In short, contrary to McGonegle's argument, not all "physical or mental impairments"—even of a "major bodily function"—constitute "disabilities" for purposes of the statutory text. Rather, it is only those "physical or mental impairment[s] that substantially limit[] one or more major life activities" that count as "disabilities." 42 U.S.C. § 12102(1).

Because McGonegle's approach is fundamentally inconsistent with the statutory text, the Court rejects it. Rather, to show a "substantial limitation" on the "operation of a major bodily function," the Court holds that a plaintiff must make some showing that the impairment as to the operation of that person's identified "major bodily function" (i.e., the diagnosed "condition") also results in some meaningful functional difficulty as compared to the population at large. And those difficulties must be more than merely "inconvenient" to achieve the "severity required to qualify the ailment as a substantial limitation." *See Jones v. AKKO Fastener, Inc.*, No. 1:09-cv-286, 2010 WL 3365940, at *11 (S.D. Ohio Aug. 23, 2010). After all, the ADA still places the burden on the plaintiff to show that his impairment constitutes a disability. *Whitesell v. FMS Fin. Mgmt. Servs., LLC*, No. 3:18-cv-00496, 2020 WL 2770017, at *4 (M.D. Tenn. May 28, 2020).

The bottom line is that showing an impairment is not enough, in and of itself, to survive summary judgment on an "actually disabled" argument. Rather, a plaintiff must show that, because of the identified impairment, he or she is "significantly *restricted* … as compared to the average person in the general population." *Southall v. USF Holland*, No. 3:15-cv-1266, 2018 WL 6413651, at *7 (M.D. Tenn. Dec. 5, 2018) (emphasis added). McGonegle has failed to identify any such restrictions here. Thus, while the Court does not dispute that his essential tremor constitutes an "impairment," the Court nonetheless finds as a matter of law that, on the facts presented here, McGonegle has not shown that this impairment rises to the level of a "disability" under the ADA's definition.

### 2. *McGonegle Has Made A Prima Facie Case For His Regarded-As-Disabled Theory.*

McGonegle's inability to show a "disability," however, is not dispositive for his regarded-as-disabled theory. "[T]o state the threshold condition of a 'regarded as' ADA claim, an employee need only show that [his] employer believed [he] had a 'physical or mental impairment,' as that term is defined in federal regulations. The employer may then rebut this showing by pointing to objective evidence 'that the impairment is (in the case of an actual impairment) or would be (in the case of a perceived impairment) both transitory and minor.'" *Babb*, 942 F.3d at 319 (quoting 29 C.F.R. § 1630.15(f)). "'[P]hysical impairment' is otherwise defined broadly, to include 'any physiological disorder or condition … affecting one or more body systems.'" *Id.* (citing 29 C.F.R. § 1630.2(h)).

Notably, unlike the case with an actual disability argument, this regarded-as-disabled inquiry does *not* turn on whether "the impairment limits or is perceived to limit a major life activity." *Id.* (quoting 42 U.S.C. § 12102(3)(A)). Instead, the employer only needs to have known about its employee's impairment. Nor is there any need to show that the impairment results in a "substantial limitation." Rather, the only exclusion from coverage under the ADA for regarded-as-disabled theories is that they "shall not apply to impairments that are transitory and minor." 42 U.S.C. § 12102(3)(B). And, even on that front, the "'transitory and minor' limitation is an affirmative defense that the employer bears the burden of proving." *Babb*, 942 F.3d at 319 (citing 29 C.F.R. § 1630.15(f)). In short, to proceed on a regarded-as-disabled theory, McGonegle need only show that Sleep Number knew or believed he had an "impairment" of some kind. If he can, then the burden then shifts to Sleep Number to show that McGonegle's impairments were transitory and minor. If it cannot do so, then McGonegle's regarded-as-disabled argument satisfies the prima facie case at the first *McDonnell Douglas* step.

Here, McGonegle alleges that Sleep number regarded him as impaired based on one or both of two conditions: his essential tremor and alcoholism. Notably, as to the latter, McGonegle is not claiming that he suffers from alcoholism. Rather, he asserts that his employer regarded him as suffering from alcoholism *because of* the tremor—more particularly, that Sleep Number wrongly believed that the tremor resulted from a drinking problem. (Pl.'s Sur-Reply, Doc. 33-1, #673–74). Still, there is no dispute that McGonegle advances two separate "perceived impairments" in

21

support of his regarded-as-disabled theory: (1) his employer fired him because it regarded his tremor as an impairment; and (2) his employer fired him because it regarded him as suffering from alcoholism. (Pl.'s Resp., Doc. 31, #611). The Court thus considers whether McGonegle can overcome summary judgment on either of those theories.

The Court begins with an issue common to both alleged impairments. Although the parties agree that McGonegle must identify an alleged "impairment," they dispute what he must show to do so. For example, no one disputes that McGonegle suffers from an essential tremor and that Sleep Number knew about that condition. According to McGonegle, the prima facie case for his regarded-as-disabled theory ends there—his tremor is an impairment, Sleep Number knew about that impairment, and that is that.

Sleep Number, though, has a different view on the necessary showing for an "impairment." Sleep Number concedes that it knew about McGonegle's condition and physical symptoms, but claims that McGonegle's tremor was not an "impairment" because it did not hinder him at work or carry any serious negative effects (i.e., impairments). In other words, Sleep Number contends that it could not have "perceive[d] McGonegle to have an impairment related to the tremor at all" because no Sleep Number employee or official "suggested that he was bad at his job or that he could not perform job duties." (Def.'s Mot. for Summ. J., Doc. 28, #535).

Sleep Number's argument cannot be squared with the ADA's text. As the Sixth Circuit put it, "an employee need only show that [his] employer believed [he] had a

'physical or mental impairment,' as that term is defined in federal regulations" to make a prima facie case for a regarded-as-disabled ADA argument. *Babb*, 942 F.3d at 319. And "physical impairment" is "defined broadly, to include 'any physiological disorder or condition … affecting one or more body systems.'" *Id.* (quoting 29 C.F.R. § 1630.2(h)). Here, there can be no dispute that essential tremor is a "disorder or condition" that "affects one or more body systems," a term which expressly includes the neurological system. 29 C.F.R. § 1630.2(h)(1). Thus, Sleep Number's concession that it knew about McGonegle's tremor suffices to show that it was aware of an "impairment."

The analysis also reaches the same conclusion for McGonegle's alcoholism theory, but there is a detour along the way. Namely, as a threshold matter, Sleep Number claims that the alcoholism regarded-as-disabled issue is not properly before the Court. That is so, Sleep Number says, for two reasons. First, Sleep Number contends that McGonegle's failure to reference alcoholism in his Complaint forfeited that theory as a response to Sleep Number's Motion for Summary Judgment. (Def.'s Reply, Doc. 32, #658). Second, Sleep Number claims that McGonegle needed to exhaust his alcoholism discrimination theory before the EEOC before pursuing it as part of his ADA claim. (*Id.* at #659). The Court finds neither argument persuasive.

To be sure, Sleep Number is correct that "a plaintiff may not expand [his] claims to assert new theories in response to summary judgment or on appeal." *Renner v. Ford Motor Co.*, 516 F. App'x 498, 504 (6th Cir. 2013). But that principle does not get Sleep Number to its desired result. Although Sleep Number rightly notes that

McGonegle's Complaint does not address alcoholism-based discrimination, the Complaint does allege that Sleep Number terminated McGonegle's employment because of his shaking hands. Now, McGonegle claims that his employer associated his shaking hands with alcoholism, which he offers as *a reason* for the discrimination alleged in the Complaint. What is more, McGonegle has not added any additional claims on summary judgment and his overall theory remains the same (i.e., Sleep Number fired him because of his shaking hands). Accordingly, the Court finds that McGonegle has not improperly expanded his claim in his opposition to Sleep Number's Motion for Summary Judgment.

Likewise, the Court finds that McGonegle did not have to, and thus did not impermissibly fail to, exhaust his alcoholism discrimination theory. "[A] party's discrimination claim in the District Court may include claims 'limited to the scope of the EEOC investigation reasonably expected to grow out of the charge of discrimination.'" *Davis v. Sodexo, Cumberland Coll. Cafeteria*, 157 F.3d 460, 463 (6th Cir. 1998) (quoting *EEOC v. McCall Printing Corp.*, 633 F.2d 1232, 1235 (6th Cir. 1980)). During discovery, McGonegle learned that his supervisor might have negatively associated his tremor with alcoholism. Accordingly, his regarded-as-disabled argument based on alcoholism "grew out of" his original disability discrimination claim, which centered on that same essential tremor. Thus, the Court concludes that neither procedural argument bars McGonegle from pursuing his regarded-as-disabled argument based on that theory.

The next question, then, is whether McGonegle can survive summary judgment as to his alcoholism theory at step one of the *McDonnell Douglas* test. The Court starts by noting that there is no question that alcoholism constitutes an impairment under the ADA. *Marrari v. WCI Steel, Inc.,* 130 F.3d 1180, 1185 (6th Cir. 1997) ("There is no dispute that alcoholism is a disability within the protection of the ADA."). And, on the record here, McGonegle has shown there is a genuine dispute as to whether Sleep Number (especially in the person of his supervisor, Roborecki, who allegedly pushed for McGonegle's termination) "perceived" him as suffering from alcoholism based on his shaking hands. For example, he points to testimony revealing that Roborecki told Matt Lamantia, another Sleep Number employee, that a customer had remarked that McGonegle's shaking hands might be due to alcoholism. (Lamantia Dep., Doc. 26, #495). In the same conversation, Lamantia also testified, Roborecki worried out loud about whether McGonegle had a drinking habit. (*Id.*). Based on such testimony, the Court finds McGonegle has cleared the bar, at least for summary judgment purposes, for showing a factual dispute about whether his employer regarded him as suffering from alcoholism, and thus having a perceived impairment on that basis under the ADA.

In short, to meet the first element of his prima facie case for a regarded-as-disabled argument, McGonegle need only show that he was regarded as having an "impairment." He has made a sufficient factual showing as to two impairments, i.e., alcoholism and essential tremor, to avoid dismissal of his claim at the summary judgment stage.

To be clear, Sleep Number could have sought to challenge McGonegle's showing on that front by demonstrating that the impairments at issue were "minor and transitory," and thus would not support a regarded-as-disabled argument. *See Lackey v. Heart of Lancaster Reg'l Med. Ctr.*, 704 F. App'x 41, 49 (3d Cir. 2017) (finding plaintiff did not establish an impairment because she failed to show that her tremor "was not transitory and minor"). But Sleep Number did not make that argument (for which it bears the burden of proof), and the Court will not sua sponte consider potential arguments that a party has not elected to raise (nor, in any event, does it seem a very strong argument here).

Thus, McGonegle has made the necessary showing for the first element of the five-element prima facie case for his regarded-as-disabled theory. And, because Sleep Number has not attempted to show that McGonegle failed to meet any other element of that prima facie case, that means that McGonegle has shown enough to satisfy step one of the *McDonnell Douglas* burden-shifting test.

## B. McGonegle Has Identified A Genuine Dispute As To Whether Sleep Number's Proffered Reasons For Termination Are Pretextual.

Once an employee satisfies the first step of the *McDonnell Douglas* test as to a disability discrimination claim, an employer may nonetheless rebut that claim by pointing to a legitimate, non-discriminatory reason for the adverse employment action. *Babb*, 942 F.3d at 320. Sleep Number pursued that avenue here by claiming that it fired McGonegle because he (1) improperly issued a "Friends and Family" discount to a nonqualifying customer, and (2) responded inappropriately when approached about his interactions with that customer. Neither party disputes that

26

those reasons, on their face, are legitimate and non-discriminatory, and thus suffice for purposes of the second *McDonnell Douglas* step. The remaining question then becomes whether McGonegle can show that those reasons were pretextual, and thus permit an inference of discrimination (the third and final *McDonnell Douglas* step).

"A plaintiff can establish pretext by showing that the proffered reason: '(1) ha[d] no basis in fact; (2) did not actually motivate the [adverse employment] action; or (3) [was] insufficient to warrant the [adverse employment] action.'" *Brown v. Kelsey-Hayes Co.*, 814 F. App'x 72, 80 (6th Cir. 2020) (alterations in original). "To survive a motion for summary judgment, the plaintiff need not *prove* that the defendant's proffered rationale is pretextual, as that would be enough proof for summary judgment in favor of the plaintiff. Rather, the plaintiff must prove only enough to create a *genuine issue* as to whether the rationale is pretextual." *Whitfield*, 639 F.3d at 260. By creating "a genuine issue of material fact over the truthfulness" about the employer's proffered reason for termination, an employee satisfies the *McDonnell Douglas* pretext requirement at the summary judgment stage. *Stokes v. Detroit Pub. Schs.*, 807 F. App'x 493, 504 (6th Cir. 2020) (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 148 (2000)).

Under such case law, McGonegle need only show a dispute of material fact about whether Sleep Number's proffered reasons for termination are pretextual. The Court finds that McGonegle has done so. As noted, Sleep Number appears to be offering two reasons: (1) the alleged unauthorized discount, and (2) McGonegle's alleged improper reaction to Roborecki's reproach. But the record makes clear that

these are not two *separate* bases. Rather, Sleep Number *admits* that it does not fire employees for their first offense when it comes to improper discounting, (Dudley Dep., Doc. 25, #481), and the Sleep Number HR person involved in the termination decision here likewise testified under oath that Sleep Number does not ordinarily terminate employees for a first offense of offering an improper discount. (*Id.* at #477). Thus, not surprisingly, that same HR employee also stated in an email that, while Sleep Number's HR policy technically permitted firings for offering an improper Friends and Family discount, McGonegle's alleged improper discount here, absent other circumstances, warranted a verbal reprimand, not termination of employment. (Dudley Email, Doc. 22-6, #379–80). Indeed, Roborecki (i.e., McGonegle's boss, who initiated the termination process), when asked whether the discount was the reason for his termination, said this: "I would say that a corrective action was given to [McGonegle] regarding that. Was he terminated specifically for that reason? No." (Roborecki Dep., Doc. 22, #344). In short, Sleep Number did not fire McGonegle for rendering an improper discount, and if it had done so, by its own admission it would have been treating him differently from other similarly situated employees.

But, as the alleged improper discounting is not a sufficient (or even the claimed) reason for McGonegle's termination, then that reason can only be considered *in combination with* the other proffered reason—McGonegle's allegedly hostile reaction when confronted by Roborecki. That immediately leads to an insurmountable problem for Sleep Number on summary judgment because there is a genuine dispute as to the nature of that interaction. To be sure, Roborecki claims that

McGonegle reacted in an indecorous fashion, but McGonegle says that simply is not true—a classic he-said/she-said situation.

Sleep Number tries to avoid this problem by claiming that many aspects of the interaction, such as the claim that McGonegle left the building after arguing with Roborecki, are undisputed. But the undisputed parts do not suffice to make the interaction a legitimate reason for the termination. The key parts of the description, from the Court's perspective, include the yelling, the language used, and the physical act of banging on the desk, all with customers allegedly present. But none of those are undisputed. Rather, there are only two witnesses, McGonegle and Roborecki, and they strongly disagree as to those details. Perhaps if there had been affidavits from the others allegedly in the store, especially affidavits uniformly supporting one version or the other, one could ask whether any remaining dispute is "genuine," but in the absence of such evidence, this strikes the Court as exactly the type of credibility determination that the legal system assigns exclusively to a jury.

Finally, it is of little consequence that the actual termination decision was made by other Sleep Number employees (i.e., persons aside from Roborecki). Neither party disputes that those Sleep Number employees made the termination decision based on the information that Roborecki provided. Under the well-settled "cat's-paw doctrine" in discrimination claims, a biased supervisor's influence on an employer's adverse employment action can create liability for the employer. *Staub v. Proctor Hosp.*, 562 U.S. 411, 421 (2011) ("The employer is at fault because one of its agents committed an action based on discriminatory animus that was intended to cause, and

did in fact cause, an adverse employment decision."). So if Roborecki intentionally misled other employees about what occurred in her interaction with McGonegle in support of her efforts to terminate him on discriminatory grounds, then her discriminatory intent is imputed to those other actors even if Roborecki herself lacked authority to make a termination decision. *See Marshall v. The Rawlings Co.*, 854 F.3d 368, 384 (6th Cir. 2017) (holding that the district court erred by granting summary judgment to an employer on an ADA claim despite a factual dispute about biased supervisors potentially influencing an adverse employment action). In the end, McGonegle has at least shown a factual dispute about whether (1) Roborecki believed McGonegle suffered from an impairment; (2) Roborecki influenced Sleep Number's decision to fire McGonegle; and (3) that his termination was pretextual. Given the cat's-paw doctrine, those showings preclude entering summary judgment in Sleep Number's favor even though McGonegle only alleged that Roborecki, and not Sleep Number's decisionmakers, harbored any discriminatory animus.

In sum, at this stage and given the record before it, the Court must accept as true McGonegle's testimony that he behaved properly when Roborecki approached him about the potential improper discount. And because McGonegle's allegedly inappropriate behavior is necessary to establish Sleep Number's legitimate, nondiscriminatory reason for firing him, he has established a genuine dispute of material fact as to the third prong of the *McDonnell Douglas* test. Thus, the Court **DENIES** Sleep Number's Motion for Summary Judgment on McGonegle's discrimination claim based on his regarded-as-disabled theory.

## CONCLUSION

For the reasons above, the Court **DENIES** Sleep Number's Motion for Summary Judgment (Doc. 28). While the Court holds as a matter of law that Sleep Number has shown McGonegle was not "actually disabled" under the ADA, Sleep Number failed to demonstrate the absence of a genuine dispute as to (1) whether Sleep Number regarded McGonegle as impaired, or (2) that it terminated McGonegle's employment for a legitimate, non-pretextual reason. McGonegle can thus proceed on his regarded-as-disabled theory, both under the ADA and corresponding Ohio state law.

**SO ORDERED.**

January 22, 2021
**DATE**

**DOUGLAS R. COLE**
**UNITED STATES DISTRICT JUDGE**